UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ADOLFO GALVEZ,

        Plaintiff,

v.                                          Case No: 8:06-CV-2176-T-27MSS

HENRY BRUCE, a Hillsborough County
Sheriff, in his individual capacity,

        Defendant.
_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 16), to which Plaintiff has responded in opposition (Dkt. 24). Upon consideration, Defendant's motion is GRANTED.

### *Background*[1]

In this excessive force action, brought pursuant to 42 U.S.C. § 1983, Plaintiff Adolfo Galvez ("Galvez") alleges that Defendant Henry Bruce ("Bruce"), a Hillsborough County Sheriff's Deputy, used excessive force when he arrested Galvez for petit theft and resisting arrest without violence by slamming him against a wall, which he alleges resulted in two fractured ribs and other maladies. The relevant undisputed facts follow.

On September 20, 2004, sixteen year-old Crystal Reese, who is not a party to this action,

---

[1] Plaintiff's response in opposition contains no citation to record evidence, in violation of this Court's Case Management and Scheduling Order (Dkt. 11 at 3) and includes only a cursory review of the chronology of events. (Dkt. 24 at 1-3). In an effort to set forth the facts in the light most favorable to Plaintiff, this Court has thoroughly reviewed the depositions submitted by Defendant.

1

pulled her car into the driveway of Galvez's walk-in medical clinic because her car was overheating. (C. Reese Dep. at 5, 7-8). As she pulled in, Reese hit one of the traffic cones in the driveway. (C. Reese Dep. at 8-9). Reese knocked on the door to the clinic and asked Galvez's wife, Maria Galvez, if she could get some water from the spigot outside the office. (C. Reese Dep. at 9, 11-12). Reese testified that Galvez and his wife were upset at the damage to the traffic cone and asked for a copy of her license so that he could get in touch with her if she did not pay for the damage. (C. Reese Dep. at 9-10).[2] They also agreed to let Reese use water from the spigot for her car. (C. Reese Dep. at 11-12). Reese gave Galvez her license, waited approximately fifteen minutes for Galvez to return the license, and then knocked on the door again. (C. Reese Dep. at 12).[3] Because she could see people peering at her through the window, Reese called her mother for assistance. (C. Reese Dep. at 12). Reese's sister, Andrea Reese, and her mother's co-worker, Jamie Gevendon, arrived at the scene. Andrea Reese testified that when she went into the clinic, Mrs. Galvez refused to return the license and informed her the police were on the way. (A. Reese Dep. at 11-12). Gevendon also asked Galvez for the license, which she alleges he showed her and then put in his pocket. (Gevendon Dep. at 16-17). At 6:22p.m., Reese's mother called the Sheriff's office for assistance. (Dkt. 16, Exh. G). Galvez also called the police. (Pl. Dep. at 78).

Defendant Bruce was dispatched to the scene. After interviewing Reese, he knocked or rang the bell to the office. (M. Galvez Dep. at 42-43). When Mrs. Galvez opened the door, she testified that Bruce used an "authoritative" voice and asked for Reese's license. (M. Galvez Dep. at 45-47). Mrs. Galvez and Bruce argued about the license, and Galvez came out from the examining room.

---

[2] Galvez maintains that they wanted identification in case Reese left the car in the driveway. (Exh. H. at 1).

[3] Mrs. Galvez testified that she was waiting for Reese to "come back and ask nicely" (M. Galvez at 42).

(M. Galvez Dep. at 46-49). Galvez testified that he came out to give "a proper explanation as to the misunderstanding of Reese and company accusations." (Dkt. 16, Exh. H at 3). Galvez and his wife were upset because Bruce continued to demand return of the license and did not ask for their side of the story. (Pl. Dep. at 95).

When Galvez told Bruce that they had photocopied Reese's license, he alleges that Bruce became upset, tried to search his right pants pocket, twisted his hand and shoulder, and slammed his chest into a rack of medical records. (Pl. Dep. at 94, 114, 127). Galvez testified that he was frustrated because Bruce searched his pocket without a warrant and because Bruce was "treating me like a criminal, treating me like what we call a terrorist, treating me like -- not treating me like a doctor." (Pl. Dep. at 95-96). Galvez testified that when Bruce grabbed his arm, he knew that Bruce was trying to handcuff him. (Pl. Dep. at 117). Galvez testified that he then saw the license and "I was able to get out of his hold and able to reach for the driver's license to give it to him . . . . but unfortunately he pushed me aside and I was not able to give it willingly." (Pl. Dep. at 118, 129). Mrs. Galvez testified that her husband resisted Bruce's attempts to handcuff him "because he believes he has no fault." (M. Galvez Dep. at 58). Galvez stated that Bruce then grabbed a stack of papers and that he grabbed them back because Bruce had taken both the license and other confidential medical records. (Pl. Dep. at 120-21). Galvez testified that the license then "unconsciously" fell into his right pants pocket, under his white doctor's coat. (Pl. Dep. at 129-31).[4]

According to Galvez, Bruce then "dragged" Galvez out of the office, in handcuffs -- although

---

[4] Mrs. Galvez also testified:
Q: What did you see him do?
A: Put the laboratory, the driver's license in his pocket.
Q: Why did he do that?
A: I don't know. He's unconsciously shocked with what happened or something like that.
(Galvez Dep. at 56).

3

Galvez also testified that Bruce was using one hand to talk on his cell phone and was walking behind him. (Pl. Dep. at 132-33). Galvez testified that he was screaming to passing cars "to stop Deputy Bruce from killing me and slamming my chest and breaking my ribs . . . I just used my voice to let the motorists know that such a thing, you know, that he was subjecting me to is just like what the policemen were doing in California when Rodney King was subjected to such police brutality." (Pl. Dep. at 135-36). Galvez testified that he believed Bruce was trying to kill him. (Pl. Dep. at 141). Galvez also testified:

> Q: What about physically, what was your body doing?
>
> A: Nothing. What can I do, you know, with my handcuffs? What do you think? You think I will be able to use my force with him with both hands in handcuffs? I'm sure.
>
> Q: Did you try?
>
> A: No, I didn't try. How can I try? I will get hurt if I try.
>
> Q: Were you cooperating with him?
>
> A: Yes. When he led me all the way to the corner of the carport where there is already concrete, he was able to get me there. Otherwise, if I did not cooperate, I could have been -- me and him could have been rolling around the ground, you know, as far as what he was doing to me, a pat down search.
> (Pl. Dep. at 134).
> . . . .
>
> Q: What happened as you were walking out of the clinic?
>
> A: Well, he was able to get me into the corner.
> (Pl. Dep. at 136).
> . . . .
>
> Q: When you were up against the wall, isn't it true that you were twisting and resisting Deputy Bruce?
>
> A: Well, because I don't know what I was doing, but I am already getting to get really hurt, subjected to the slamming of my ribs, you know?

4

(Pl. Dep. at 140).

Galvez testified that Bruce then slammed him into a wall at the edge of the carport three or four times. (Pl. Dep. at 137-38). This allegation forms the basis of Plaintiff's excessive force claim. Plaintiff expressly disclaims any reliance on what occurred inside the clinic in support of his excessive force claim. (Dkt. 24 at 6, n.2).

The witnesses provide a somewhat different account of Galvez's behavior outside of the office. Andrea Reese testified that Galvez was fighting Bruce "every inch of the way" and "trying to flail out of his arms and trying to shove him off of him." (A. Reese Dep. at 17). Crystal Reese testified that "it looked like he was trying to get away from that officer. So the officer had taken him and shoved him against the outside wall of the carport." (C. Reese Dep. at 18). Bruce has not provided his own account of the incident.

According to Galvez, Bruce "got all of the things in all of my pocket" and gave them to Mrs. Galvez. (Pl. Dep. at 143). At some point, two additional deputies arrived to assist Bruce. (Dkt. 16, Exh. M). The deputies eventually let Galvez back into his office, where Bruce asked him if he was injured and offered to call an ambulance. (Pl. Dep. at 152, 154). Galvez elected to have his wife take him to the hospital that day because "I don't know whether if what you call an ambulance came and instead of going to the emergency room, I may what you call be hijacked into the jail, you know?" (Pl. Dep. at 152, 154). Galvez received x-rays of his chest, wrist, and ribs, which were negative for fractures. (Pl. Dep. at 165). Galvez took a picture of a bruise on his right inner thigh, which he believed was from Bruce's knee when he was pinned against the wall. (Pl. Dep. at 161). On September 29, 2004, Galvez had a bone scan which showed "increased uptake in the left anterior

fourth and fifth ribs compatible with rib fractures."[5] (Pl. Dep. at 167). A CAT scan also showed a possible "leaking aneurysm" in Plaintiff's chest. (Pl. Dep. at 171).

The deputies returned Reese's license to her before she left. (C. Reese Dep. at 30). There was no permanent damage to the traffic cone. (Pl. Dep. at 65). Galvez was charged with resisting an officer without violence, a first degree misdemeanor, and petit theft, a second degree misdemeanor. (Dkt. 16, Exh. M). The parties agree that the charges against Galvez were ultimately dropped. (Dkt. 16 at 10; Dkt. 24 at 2, n.1).

### *Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and

---

[5] Neither party has submitted the medical record containing this language. The quoted language was read by defense counsel during Plaintiff's deposition.

admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

## Discussion

Defendant Bruce contends that he has qualified immunity. "Qualified immunity protects government officials performing discretionary functions from individual liability as long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "The purpose of this immunity is to allow governmental officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Id.* (quoting *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002)).

Defendant was acting in the scope of his discretionary authority in carrying out the arrest of Plaintiff. Accordingly, Plaintiff bears the burden of overcoming the defense of qualified immunity. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007). To determine whether qualified immunity applies, the court resolves a threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'" *Scott v. Harris,* --- U.S. ----, 127 S.Ct. 1769, 1774 (2007) (quoting *Saucier v. Katz,* 533 U.S.

194, 201 (2001)). "If, and only if, the court finds a violation of a constitutional right," does the court ask whether the right was clearly established at the time of the violation. *Id.*

1. *Fourth Amendment Violation*

Plaintiff has alleged that Bruce violated his Fourth Amendment right to be free from the use of excessive force during the course of an arrest. *Davis v. Williams*, 451 F.3d 759, 767 (11th Cir. 2006); *see also* U.S. Const. amend. IV. In determining whether the amount of force used by Bruce was excessive, the Court evaluates "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Beshers*, 495 F.3d at 1266 (internal quotations omitted). To assess whether the force used was reasonable, Court examines: (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted. *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004). The need for application of force is measured by weighing "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Davis*, 451 F.3d at 767 (internal quotations omitted); *Draper*, 369 F.3d at 1278 n.13. Careful attention must be given to the facts and circumstances of each particular case. *Graham v. Connor*, 490 U.S. 386, 396 (1989). In addition, an officer's actions are viewed from the "'perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and 'must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.'" *Beshers*, 495 F.3d at 1266 (quoting *Graham*, 490 U.S. at 396-97).

In evaluating the need for force in the instant case, the Court notes that the crimes with which

Galvez was charged were misdemeanors: petit theft and resisting an officer without violence. The evidence indicates, however, that Galvez did not cooperate with Bruce's requests for the return of the license and physically resisted Bruce's attempts to handcuff him. Specifically, Galvez testified that Bruce "was not able to handcuff me properly and I was able to get out of his hold and able to reach for the driver's license to get it to him" and that he then grabbed the license and other papers back from Bruce's hands. (Pl. Dep. at 118 ,120-21). At one point in his deposition, Galvez testified that he did not do anything "physically" after he was handcuffed.[6] When asked if he was *cooperating* with Bruce, however, Galvez essentially avoided the question, stating that if he had not been cooperating, he and Bruce would have been down on the ground or Bruce would not have been able to get him to the carport.[7] Moreover, there is ample evidence from the Reese sisters that Plaintiff was not cooperative, and it is undisputed that Galvez, even if not physically struggling, was screaming at passing motorists about police brutality and Rodney King while Bruce led him outside.

There is no dispute that Galvez physically resisted Bruce's efforts to handcuff him. To the extent there is a disputed issue of material fact regarding Plaintiff's physical resistance after he was handcuffed, the Court will resolve this dispute in Plaintiff's favor for the purposes of this discussion. *See Lee*, 284 F.3d at 1190 (noting that the facts at summary judgment "may not be the actual factors

---

[6] Plaintiff testified, in part:
Q: What about physically, what was your body doing?
A: Nothing. What can I do, you know, with my handcuffs? What do you think? You think I will be able to use my force with him with both hands in handcuffs? I'm sure. (Pl. Dep. at 34).

[7] Mrs. Galvez's testimony was similarly confusing:
Q: It's your testimony that as he was being escorted out and as they went over to the carport areas, the doctor was not struggling or resisting the deputy in any way?
A: He was struggling already, Attorney. When he was dragged, no. He walked. He is already struggling when Deputy Bruce pushed him too hard on his left side that *you are killing me, you are brutalizing me like Rodney King, like what happened with the child that died in the camp or something like that.* (M. Galvez Dep. at 62).

9

of the case"). Taking the facts in the light most favorable to Plaintiff, it appears that although Plaintiff may have ceased any physical resistance, his cooperation was not complete, as he was screaming at passing motorists about police brutality as he was being led outside. Galvez was not, therefore, fully secured. He unquestionably had not "docilely submitted." *Smith v. Mattox*, 127 F.3d 1416, 1420 (11th Cir. 1997) (denying qualified immunity in excessive force case where officer broke arm of individual who had "docilely submitted"). Accordingly, Bruce was entitled to use some degree of force to completely secure Plaintiff, and the first factor in the excessive force calculus weighs in favor of Bruce.

Indeed, it is well established that "some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense." *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003). The Eleventh Circuit has repeatedly found that the use of force involving some measure of rough contact during an arrest may be appropriate, such as pushing, shoving, or using a knee or a chokehold. *See Nolin v. Isbell*, 207 F.3d 1253, 1258 n.4 (11th Cir. 2000) (officer grabbed plaintiff, shoved him against a vehicle, pushed his knee into plaintiff's black, searched his groin in an uncomfortable manner, and handcuffed him); *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997) (two officers "slammed" suspect against wall, kicked his legs apart, required him to raise his arms, and pulled his wallet from his pants); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1556 (11th Cir. 1993) (officer placed plaintiff in chokehold and handcuffed him, took him outside, and pushed him against a wall when he continued speaking after being told to "shut up"). Consistent with the foregoing cases, qualified immunity typically applies to force exerted before an arrestee is fully secured. *Lee*, 284 F.3d at 1199-1200; *see also Durruthy*, 351 F.3d at 1094 (specifically noting that plaintiff had not already been

10

restrained when the force was applied).

*Post v. City of Fort Lauderdale* provides analogous facts to the events following Galvez's handcuffing. In *Post*, "[Defendant] took [Plaintiff] outside. When [Plaintiff] make a remark, [Defendant] told [Plaintiff]: 'shut up, you're under the control of the hatchet man for the commissioner now.' When [Plaintiff] kept speaking, [Defendant] pushed [Plaintiff] against a wall." *Post*, 7 F.3d at 1556. In determining that reasonable doubt existed as to whether the amount of force exerted was unlawful, the Eleventh Circuit cited to a number of cases finding that the Fourth Amendment does not protect against the use of *de minimis* force. *Id.* at 1560; *see Nolin*, 207 F.3d at 1257 ("the application of de minimis force, *without more*, will not support a claim for excessive force in violation of the Fourth Amendment") (emphasis added).

Notwithstanding certain factual similarities, the instant case differs from *Post* and the above-cited cases because the extent of Galvez's injury was not "*de minimis*," to the extent the medical evidence is viewed in the light most favorable to Plaintiff.[8] Defendant correctly notes that the x-rays taken the day of the incident did not show fractures to Plaintiff's ribs. However, the bone scan taken nine days later did show "increased uptake in the left anterior fourth and fifth ribs compatible with rib fractures."[9] A CAT scan showed a leaking aneurysm in Galvez's chest. Plaintiff also alleges that his thigh was bruised. Thus, to the extent it must be inferred that Galvez sustained two rib fractures, a leaking aneurysm in his chest, and a bruised thigh as a result of the encounter with Bruce,

---

[8] *Cf. Post*, 7 F.3d at 1559-60 (plaintiff sought no medical treatment until three years after incident); *Nolin*, 207 F.3d at 1257 (plaintiff had "minor bruising which quickly disappeared without treatment"); *Jones*, 121 F.3d at 1460 (noting that both force and injury were "minor" where plaintiff received medical treatment for pain in his arthritic knee three days after incident).

[9] Defendant may present evidence concerning the nature and cause of this injury at trial. The Court does not evaluate several of Galvez's other self-diagnosed physical injuries, as they appear to be based only on his personal speculation. (*See e.g.*, Dkt. 16 at 20-22).

11

the third factor in the calculus of reasonableness, the extent of Plaintiff's injury, weighs in favor of Galvez.[10]

In summary, the first factor -- the need for application of force -- weighs slightly in favor of Bruce, while the third factor -- the extent of the injury -- weighs in favor of Plaintiff. The second factor -- the relationship between the need and the amount used -- also tips in Plaintiff's favor. It is well-settled that "the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). Bruce did not merely push Galvez against a wall, but "slammed" him against the wall three or four times, according to Plaintiff. Plaintiff alleges that this action resulted in the two fractured ribs, a leaking aneurysm, and a bruised thigh. As discussed, these injuries belie Defendant's contention that only minimal force was used, and remove this case from the ambit of *Post* and the *de minimis* force cases.

Finally, and perhaps equally significant in assessing the second factor, Bruce has not supplied any affidavit or cited to any other record evidence indicating that the action he took was in an effort to curtail Galvez's shouting or to obtain the license, that the force used was an appropriate law enforcement technique under the circumstances, or that there was any other reasonable justification

---

[10] For instance, in *Smith v. Mattox*, where an officer broke the plaintiff's arm while handcuffing him, the Eleventh Circuit found that the extent of the injury supported a finding of excessive force: "[A]ssuming as we must that Smith was offering no resistance *at all*, the considerable effort and force inferable from the grunt, Smith's sensation of a blow, and the broken arm was obviously unnecessary to restrain even a previously fractious arrestee." *Smith v. Mattox*, 127 F.3d at 1420. Conversely, in *Gold v. City of Miami*, in which the plaintiff suffered only skin abrasions for which he did not seek treatment, the Eleventh Circuit observed that the "minor nature of this injury reflects that minimal force was used to apply the handcuffs." 121 F.3d 1442, 1446-47 (11th Cir. 1997).
   Defendant has not argued that Galvez's rib injury was due to a pre-existing medical condition, which would weigh against finding excessive force. *See e.g., Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) (officer used established handcuffing technique that loosened surgical hardware and ultimately led to the amputation of the arm); *cf. Davis*, 451 F.3d at 767-68 (officer intentionally applied force to plaintiff's shoulder after being told it was injured).

for his alleged conduct. *Cf. Hernandez v. City of Hoover*, 212 F. App'x 774, 774-75 (11th Cir. 2006) (officer used "tibia strike," resulting in torn ligament and fractured ankle, but testified it was appropriate under the circumstances and necessary after plaintiff refused verbal commands to sit down). As a result, it is difficult to view this case from the "'perspective of a reasonable officer on the scene," without drawing unsupported factual inferences.

This Court is mindful that"[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," *Graham*, 490 U.S. at 396 (internal citation and quotations omitted), and that "a minimal amount of force and injury" will not defeat qualified immunity, *Nolin*, 207 F.3d at 1258. However, if Plaintiff's account of Bruce's actions and his injuries is accepted, as it must be for the purposes of summary judgment, there is an issue of fact as to whether the force used by Bruce was reasonably proportionate to Bruce's need to secure Plaintiff. Specifically, there are material disputed issues of fact as to the extent to which Galvez was cooperating with Bruce after he was handcuffed and as to the extent and cause of Galvez's claimed injuries. Accordingly, "whether excessive force was used in this case is an issue of fact for the jury to resolve." *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007).

2.  *Clearly Established Law*

Defendant Bruce may still be protected by qualified immunity to the extent that Plaintiff fails to carry his burden to show that the right to be free from excessive force under these circumstances was clearly established at the time of the incident. The Eleventh Circuit has held that conduct may be clearly established as illegal in three ways: 1) through explicit statutory or constitutional statements; 2) through authoritative judicial decisions that "establish broad principles of law that are clearly applicable in a variety of factual contexts going beyond the particular circumstances of the

decision that establishes the principle;" and 3) most commonly, through case law that finds the conduct unlawful in "materially similar" factual circumstances. *Griffin Indus., Inc.*, 496 F.3d at 1209 (citing *Vinyard*, 311 F.3d at 1350-52). As the foregoing indicates, there need not be a case "on all fours" with the challenged conduct, if there is a broad principle of law that applies with "obvious clarity." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004); *Powell v. Barrett*, 496 F.3d 1288, 1315-16 (11th Cir. 2007). The pertinent question is whether the controlling law at the time of the events in question gave the defendant fair and clear warning that the alleged conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Vinyard*, 311 F.3d at 1350. The only courts relevant to the determination of clearly established law are the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the Florida Supreme Court. *See Jenkins v. Talledega Bd. of Educ.*, 115 F.3d 821, 827 n. 4 (11th Cir.1997) (en banc).[11]

In excessive forces cases, the Eleventh Circuit has not hesitated to find that "an official's conduct could run so afoul of constitutional protections that fair warning was present even when particularized caselaw was absent." *Willingham v. Loughnan*, 321 F.3d 1299, 1303-04 (11th Cir. 2003) (citing cases). Plaintiff relies, in part, on two such cases. In *Lee v. Ferraro*, after the plaintiff was secured in handcuffs and "clearly posed no threat at all to the officer or to anyone else," the officer slammed her head on the trunk of her car and spread her legs with his foot. *Lee*, 284 F.3d at 1191. The plaintiff was diagnosed with "bilateral wrist trauma" and possible carpal tunnel syndrome. *Id.* at 1192. In *Slicker v. Jackson*, after the plaintiff was handcuffed, an officer slammed

---

[11] A Section 1983 claim cannot be based on violation of departmental policy, standing alone. *Ensley v. Soper*, 142 F.3d 1402, 1407 n. 4 (11th Cir.1998); *see also Davis v. Scherer*, 468 U.S. 183, 194 (1984). In the instant case, Plaintiff has referenced a provision of the Hillsborough County Sheriff's Standard Operating Procedure (SOP), which provides that the use of force shall be used in defense and that deputies "shall use only that degree of force necessary to effectively bring a subject an/or situation under control." (Dkt. 24, Exh. A). Because this provision of the SOP essentially restates the controlling case law on excessive force, it does not merit separate consideration.

his head into the pavement and kicked him in the leg, back, and head. *Slicker v. Jackson*, 215 F.3d 1225, 1227 (11th Cir. 2000). The evidence showed that Plaintiff had two knots on the back of his head. *Id.* at 1228-29. Even though the injuries in both of these cases were not serious, the Eleventh Circuit found that the force exerted was clearly disproportionate to the circumstances.

Bruce did not strike Galvez on his head, an action which is, as in *Lee* and *Slicker*, a common factual component of an officer's conduct in those cases where qualified immunity is denied.[12] This may well prevent Bruce from having fair warning from these cases that the force he used was excessive, as that distinguishing factual component is not "materially similar" to Bruce's conduct in this case. However, as the court stated in *Lee*, there is a "clear and obvious principle that *once an arrest has been fully secured and any potential danger or risk of flight vitiated*, a police officer cannot employ the severe and unnecessary force allegedly used here." *Lee*, 284 F.3d at 1200 (emphasis added). This is the type of authoritative judicial decision that establishes a broad principle of law, beyond the facts of the case, that may make a later constitutional violation clearly established.[13]

The arrestee's resistance, or lack thereof, controls the application of this principle. In both

---

[12] *See also Walker v. City of Riviera Beach*, 212 F. App'x 835, 839 (11th Cir. 2006) (officer slammed pistol into plaintiff's head while he was not resisting arrest); *Johnson v. Olgilvie*, 200 F. App'x 948, 949-50 (11th Cir. 2006) (plaintiff's head was slammed into paved parking lot after arrest). Another case cited by Plaintiff dealt with an officer striking the plaintiff's head with a heavy flashlight, which the court found constituted deadly force. *Baltimore v. City of Albany*, 183 F. App'x 891, 898 (11th Cir. 2006) ("striking a suspect in the head with a heavy flashlight or other blunt instrument . . . . constitutes deadly force under our definition of that term.") There is no allegation of deadly force in this case. In addition, the foregoing cases, as well as *Davis v. Williams*, were decided after the events at issue and are therefore not relevant to the determination of whether the law was clearly established at the time of the alleged violation.

[13] A broad principle of law, as it is defined in this context, is one that determines that "'X conduct' is unconstitutional *without tying* that determination to a particularized set of facts." *Vinyard*, 311 F.3d at 1351 (emphasis in original). Although *Lee*'s holding was premised on the "force allegedly used here," *Lee* also expressly set forth a "clear and obvious principle" applying to cases in which an arrestee is fully secured, following which severe and unnecessary force is used.

15

*Lee* and *Slicker*, the court specifically noted the lack of resistance by the plaintiffs: "Lee did not resist Ferraro at any time during this incident," *Lee*, 284 F.3d at 1191, and "once Slicker was arrested and handcuffed, he did not struggle or resist the officers in any way," *Slicker*, 215 F.3d at 1233. Even taking the facts in the light most favorable to Plaintiff, immediately before he was led outside he had physically resisted being handcuffed. As he was led outside, he was screaming at passing motorists about police brutality and Rodney King. As already noted, even Galvez, in his deposition testimony, did not claim that he offered a complete lack of resistance, which was prevalent in *Lee* and *Slicker*. Galvez was therefore not "fully secured," and any potential danger to Bruce or the bystanders was not "vitiated." Accordingly, the broad principle in *Lee* does not apply with the requisite "obvious clarity" to these facts.

Nor does this case fall within the category of cases in which the conduct is "far beyond the hazy border between excessive and acceptable force" as to be unlawful, even in the total absence of case law. *Vinyard*, 311 F.3d at 1340 n. 18 (citing cases in this category). In *Smith v. Mattox*, the Eleventh Circuit determined that although the case was "very close," the force used by the officer in handcuffing the plaintiff's arm was excessive: "[t]he grunt and the blow that Smith asserts that he heard and felt while Mattox was on Smith's back, coupled with the severity of Smith's injury, push this case over the line," albeit "barely." *Id.* at 1419. That court found that the officer was justified in using some force in handcuffing Smith, as Smith had previously held an upraised baseball bat and was not cooperative immediately before the force was applied, but held that the severity of the injury implied that excessive force was used during the handcuffing. *Id.*

The force allegedly used in the instant case does not rise to the same level of excess. If the facts of Smith made for a "very close" case, tipping in favor of finding the violation clearly

16

established, this case tips in the opposite direction, into that "hazy border between permissible and forbidden force." *Smith*, 127 F.3d at 1419. Galvez successfully thwarted Bruce's efforts to handcuff him and grabbed the license from Bruce. By his own admission, and his wife's testimony, he was not cooperative during the handcuffing. As Bruce led him outside, Galvez continued to scream at passing motorists for help before and while the force was exerted. Most importantly, there is no allegation that Galvez became suddenly and completely docile, as in *Smith*, so that he was not resisting "at all." Finally, Plaintiff's alleged injury, while not *de minimis*, was also not so severe and striking as Smith's broken arm, which was inflicted with a blow and a grunt of effort by the officer. On these facts, *Smith* is "fairly distinguishable," especially given the narrow margin by which the court in Smith determined that the force was excessive.

Moreover, at the time of the violation, *Post v. City of Fort Lauderdale* provided a countervailing authority to the cases relied on by Plaintiff. In *Post*, the Eleventh Circuit held that "even though pushing [Plaintiff] against the wall might have been unnecessary, this pushing was not plainly unlawful . . . . reasonable doubt existed, and still exists, on whether this amount of unnecessary force was unlawful." *Post*, 7 F.3d at 1552. Although, as discussed above, Galvez's injury (and the accompanying level of force) removes Plaintiff's case from the *de minimis* force line of cases, at the time of this incident, *Post* was and remains instructive in delineating the boundary between excessive and permissible force. Specifically, at the time of Bruce's actions, unnecessarily pushing an uncooperative suspect against a wall was, and apparently still is, a lawful use of force.

Based on the foregoing, this Court finds that the law at the time of the alleged violation did not provide "fair and clear notice" that Bruce's conduct was unlawful so that the violation would be "apparent." *Hope*, 536 U.S. 739; *Vinyard*, 311 F.3d at 1350. Plaintiff has identified no controlling

17

case with "materially similar" facts that would have put Bruce on fair notice that the challenged conduct was unlawful. Nor has Plaintiff demonstrated that broad principles in controlling case law applied with requisite "obvious clarity" to this case. Finally, Plaintiff has not shown that this case falls beyond the "hazy border between permissible and forbidden force," so that its unlawfulness is plain pursuant to the Fourth Amendment, even in the absence of case law.

Although this is a close case, the outcome is dictated by the dearth of applicable case law, which, when combined with the countervailing holding in *Post*, places this case squarely within that "hazy border between permissible and forbidden force." Accordingly, Plaintiff has failed to meet his burden to show that it was clearly established at the time of the alleged violation that Bruce's alleged use of force was excessive.

In light of this determination, Bruce is entitled to qualified immunity for the events at issue. Defendant's motion for summary judgment is therefore granted.

## *Conclusion*

Upon consideration, it is **ORDERED AND ADJUDGED**:

1) Defendant's Motion for Summary Judgment (Dkt. 16) is **GRANTED**.

2) All pending motions are denied as moot.

3) The Clerk is directed to close this case.

**DONE AND ORDERED** in chambers this ___18th___ day of January, 2008.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record